OLLIE WALL ET AL., RESPONDENTS, v. HENRY L. LEMONS, INC., EMPLOYER; CENTURY INDEMNITY CO., INSURER, APPELLANTS.—51 S. W. (2d) 194.

Kansas City Court of Appeals. August 26, 1932.

*Lyons & Ristine* and *B. A. Hamilton* for respondent.

*Horace F. Blackwell, Henry M. Shughart* and *Lowell R. Johnson* for appellant.

TRIMBLE, P. J.—Herein, the Employer and the Insurer have appealed from a judgment of the circuit court of Lafayette county, affirming an award of the Missouri Compensation Commission made in favor of the widow and minor child of a deceased employe, George

Wall, a truck driver for the Employer, who, while engaged in trucking for his employer, died as a result, so Claimants assert, of a fall from his truckload of pipe a distance of about five feet to the ground.

The fall occurred on the morning of October 15, 1930, and the death occurred shortly after two o'clock in the afternoon of the same day.

A claim was filed for compensation November 13, 1930, twenty-nine days after the employe's death. On February 25, 1931, the claim was heard by a Referee of the Commission who, on March 11, 1931, entered an award in favor of Claimants for the total death benefit. Application for review being filed by appellants, the full Commission, on April 3, 1931, made a final award affirming the Referee's award and granting to the Claimants compensation at the rate of $19.23 per week for 300 weeks and $150 for funeral expenses. The employer and insurers in due time appealed to the circuit court where the same was heard upon the record certified by the Commission, and on September 9, 1931, the circuit court affirmed the award of the Commission. As stated, from this judgment the employer and insurer have appealed to this court.

Prior to going to work for the Lemons Company, employer herein, deceased worked for more than a year as a truck driver for the Hinderliter Tool Company, and was paid $32 per week and all his expenses including room rent and board. While working for said Lemons Company in the same capacity, he was paid $7.50 a day. Up to October 15, 1930, and the happening of the occurrence alleged or claimed to have caused his death, George Wall was a strong able-bodied man, had never had any sickness, and when he left home to go to work on the morning of the day of his death he was well and made no complaint of feeling ill or being sick.

He was working that day near Waverly, Missouri, and was engaged in hauling a load of pipe from that place to Carrollton, Missouri. According to the testimony of deceased's fourteen-year-old son, Delmer Wall, one of the Claimants, a pipe became loose, and his father, in the attempt to fasten said pipe on the load, undertook to tighten it, and in doing so, slipped and fell about five feet to the ground, striking his side against the truck as he fell and then "scooted up on to the fender" where he vomited and then after about five minutes got back on the truck and drove on toward Carrollton. A few minutes after he got back on the truck, Delmer left his father and returned home. The father drove on to Carrollton where he met an older son, named Delbert, who says his father looked pale. The two ate their lunch and then started back to Waverly. On the way, the father became nauseated again. The father told him of having fallen from the truck, but did not tell anyone else so far as

known. They arrived at the garage at Waverly about two P. M. and in a few minutes thereafter, the father fell to the ground and died without making any further statements. A doctor, and then the coroner, were called.

No one but the fourteen-year-old son, Delmer, was with deceased when he fell. The father told the son not to say anything to his mother about the fall for fear of alarming her (she was just recovering from a serious illness), and so the boy said nothing about it, and the widow did not learn of the fall until some time thereafter when, in talking about the father's death, she expressed a wish that she knew what was the matter with him, and the boy told her of his fall. He said his failure to say anything about it before that time, was because his father had told him not to cause his mother alarm or worry, and he had not thought of the fall as having anything to do with the death. The employer must have been immediately notified because the employer's attorney was at the home the next day and talked to the widow about the death, but the boy said nothing about the fall for the reason already stated and because his father had always told him not to tell his mother of any untoward event happening to the father. (It seems, too, that the boy was not questioned at this time.)

After the burial and about three weeks after the death, the mother was grieving and "wondering what caused his death" and the boy then told her of his fall, this being the first time he had said anything to anybody about it. He said, in answer to questions about its occurrence, that his father was standing on the bed of the truck trying to "boom the pipe," i. e., hook a chain around it and pull it up tight, and it was raining and there was grease on the floor of the truck and the two made it slippery, and his father's foot slipped and he fell off the truck to the ground, striking, as he did so, the right side of his body against the truck. He sat up on the ground after a little while and then "scooted upon the fender and went to vomiting." After about five minutes on the fender he got into the cab and rode to the top of the hill. He complained of hurting in his back and rectum; looked as white as a piece of paper. He did not get up from the ground immediately but lay there "two or three minutes and then he scooted to the fender." He sat there about five minutes and then went to vomiting. When the young son left him about twenty minutes later he "looked sick" and said he "felt sick," and he was "pale looking." In coming back from Carrollton "he was vomiting; he had to stop five or six times after he came back from Carrollton." Before he fell he was apparently well, he "looked like he always did" and was "around there playing with the men." After he fell he was pale.

Doctor Lissack, who had practiced medicine for ten years, who had a good medical training and was County Coroner, saw the deceased's body about an hour after his death, and examined it to ascertain the cause of his death and whether he had come to his death by the criminal act of anyone, and satisfied himself that the deceased had not so come to his death. He did not know of the fall at that time. Considering the condition the doctor found him in and the facts related by the son, the fall might have, and could have, caused his death. The doctor testified that it is rather difficult to determine just what internal injuries will be caused by a body falling and lighting on its side from a height of five feet. He did not hold an autopsy because he knew nothing about the fall. Had he heard or known of that he would have held one. In answer to a hypothetical question embodying all the known facts, and his previous good health and his symptoms after the fall and his death thereafter, the doctor said the fall could have caused his death; that the fall could be the probable cause thereof, and that except for the fact of his fall, his death would have been unusual; but not so, if the fall and its surrounding circumstances, were known; and that, assuming Mr. Wall received an injury and died as related, then in his opinion as a medical man he would say that deceased's injury was the cause of his death. On cross-examination, the doctor testified that any shock or jolt of the body could weaken the tone of the heart muscles and cause immediate death, and would be likely to cause death three hours later through "coronary obstruction," internal hemorrhage producing some particle in the blood stream, which lodging in the smallest vessels would obstruct them. The deceased was a large fleshy man, and the doctor said: "I still maintain that the man died from coronary obstruction;" that he had seen more than one man fall in such way that three hours later he fell over dead; and that all of his answers were on the assumption that the deceased had a fall of the nature stated by the boy. He was finally asked on cross-examination, "Q. You mean to say this injury caused his death; is that what you are saying? A. Assuming the facts as I have heard them as the case has been going on, I would say yes."

Dr. George A. Kelling, who did not know the deceased, but who saw his body where it fell in the garage at Waverly, about an hour after his death, also said the death could be attributed to the injury; and that the objective symptoms of vomiting and turning pale are symptoms of an internal injury, and vomiting after an injury is a very serious symptom of a severe injury; that "coronary obstruction" could follow any injury no matter how remote.

The evidence of his widow was that her husband was forty-six. He had never been sick prior to the day of his death. He was well

that day when he left home for his work. He had never lain off his work on account of sickness. He never had heart trouble that she knew of.

His other son Delbert said the father was in good health that morning, did not complain of any sickness in the morning of the day he died. The father came by the son's house between 5:30 and six o'clock, "whistled for me, and when I came down he was standing outside and was singing, and we went to the restaurant and ate breakfast and he was just as jolly as could be." Witness saw him about 8:30 again that morning, and he appeared well and was making no complaint of any kind. But about eleven or 11:30 he saw his father at Carrollton and as soon as he, witness, saw him, he looked "peculiar." "He looked pale, so I went to him and asked him what was the matter with him, and he said he had taken a hard fall off of the truck and said he sure felt bad." Witness said to him that it was raining and they had best get dinner, which they did, the father ordering bacon and eggs, but when it came he ate just a few bites and shoved it over to the witness, who ate it along with his own order while the father drank only a little coffee, but ate nothing else. He afterward vomited a little upon coming out of the cafe. Three times on his road home he stopped the truck and vomited some more. At Waverly he got off the truck and went into the garage, while the son looked after the truck. Soon someone "hollered that the old man had fallen." The son then went and called the two doctors. Before ordering the lunch at the cafe, he appeared to have something the matter with him, "he was just pale, and he had never looked like that before and he never acted like that before. He said he hurt from his rectum up to the back of his neck." He said he had had a hard fall. Witness had never heard of his father being sick before. "He was not conscious when he fell. He never even spoke a word. He just fell, and he tried to get back on his feet, but just fell back over and said, 'Oh,' and that was all of it."

Defendants introduced the evidence of a witness who testified to having been stationed to flag trucks over the railroad the day of deceased's death; that he went with the line of six trucks of which deceased's truck was one, that he observed the deceased all the time; that no accident ever happened, the younger son was not with him but the older one was. He noticed Mr. Wall was not quite as jovial, not his usual self. "I didn't think he was feeling good." The witness first said the deceased drove his truck into the garage and then as deceased started to the door, "his feet slipped out from under him, and he fell over, possibly in about that shape, and I reached down and helped pick him, his face was black and I saw he wasn't just right and we just picked him up and laid him on some gunny

sacks.'' After massaging him they told someone to send for a doctor. Afterwards his son came in, and we told him to get his mother, and he said that he didn't want to get his mother because she had been sick and it might kill her. Afterward the doctor came and then the Superintendent came, but when the ambulance came, he was dead. Witness further said no pipe was loaded or hauled that day. On cross-examination, being asked what occurred at the garage, he said, ''It seemed as if he (deceased) fell over;'' that witness did not know what he did as to slipping, that he ''didn't mean it that way. He just went down in a heap;'' that if he said deceased's feet slipped out from under him he made a mistake. Deceased worked at hard work and long hours, but he was strong and able-bodied in every respect. He never complained. Witness admitted he was not with the trucks all the time; but said the little boy did not go with deceased that day. Said also that the claim agent of the Insurance Company came to see him very soon after deceased fell in the garage and that he, witness, made a written statement to the Insurance Company but didn't have it and did not know where it was. The counsel for the Insurance Company was then repeatedly asked, at the hearing before the Referee, to produce it but he refused on the ground that ''It is our statement and if we don't prefer to introduce it, it seems to me we are not required to.'' . . . . ''I assume it will be ample time to produce it at the hearing.'' (Before the full Commission.) The witness then testified that the only time he talked to anyone about the case or what he would testify to was the time he made the statement; that nobody ever talked to him about what his testimony would be; that they put him on the ground without knowing what he was going to swear to, and never discussed this case with anybody prior to the time of his testifying.

Another witness for defendant was put on, evidently to prove that no accident happened, no pipe was hauled that day, and he so testified. As to deceased's actions in the cafe, witness did not notice him particularly but he did notice he ''wasn't quite so jolly.'' But on cross-examination it appeared he didn't go to Carrollton with the trucks but his duty was with the first load and then he would go out in the line and help reload; that he stayed behind and then went to Carrollton in his own automobile, passing around them after they had started. Didn't know whether they loaded any pipe on October 14, 1930, or not. Some pipe was loaded out of Waverly later, that he himself was ''flagging traffic'' to and from work. They had men in the line to fasten and unfasten pipe but thought that, if a pipe came loose on the way, it was the truck driver's duty to fasten it, and that the truck driver always did that. The witness further said that the Insurance Company's claim agent came to him

about eight or nine o'clock P. M. on the 16th of October; that witness gave him a written statement, but the Company's representative refused to produce it upon request, merely replying, "Same answer as before." Witness declared he had never talked to anybody about the case, or about what he would testify to and "never discussed this case with a single soul" and that counsel didn't know what he was going to say before he put him on the stand.

Another witness testified no pipe was loaded on the 15th. He noticed Mr. Wall was "quieter than common" at the cafe but paid no attention to his looks; was the Company's foreman, was proud of his job and wanted to keep it. Witness further testified that deceased was strong and able-bodied, never laid off on account of sickness, worked every day anybody else worked. Deceased's boy did not ride on the truck. Witness sat by deceased in the cafe, he ordered a hamburger steak, did not know that he ate it all but did eat as much as half of it. No accident happened that day. Witness was at the head of the truck procession and nothing unusual happened on the way; he could look back and see the trucks all the time, and did so; that if a pipe got loose it was the driver's duty to fasten it unless it "got plumb out," then he should get help. This witness's testimony discloses on cross-examination that it was merely his *opinion* there was no accident; and that the reason he didn't think Mr. Wall was hurt was because he never made any complaint to him of any fall or accident; that the "only way I can tell he wasn't hurt" was because he, Wall, did not come to him and tell him of it. Like the others, he, too, never talked to anyone about the case; never discussed it with anybody; never told anybody what he was going to testify to, nor what his testimony would be. He didn't think it was wet or slick where Mr. Wall fell, and was willing to testify that he didn't believe it was wet though he had no recollection about it. Witness said the claim agent came to see him and the other employes the next day and took a statement from him. "What did he say to you when he asked you for the statement? A. He asked us our opinion. Q. Did he ask you for your opinion or what you knew? A. It's the same thing."

In rebuttal, claimants put on the stand the station agent of the Missouri Pacific at Waverly who showed by his records that cars of pipe were received on October 14, 1930, and unloaded by the Lemons Company and his men and *hauled away by the latter on October 15, 1930*.

The wife of the cafe owner testified that Mr. Wall came into the restaurant on the day he died somewhere between 11:15 and twelve o'clock. (Defendants' evidence was that he came in much earlier.) Witness testified that Mr. Wall ordered eggs, bread and butter and

a cup of coffee (not a hamburger as defendants' witness had said); that she did not serve any hamburger to him or to anyone else that day; that the men were talking with each other about the pipe they were hauling that day. Her husband corroborated her as to the fact that deceased ordered eggs, bread and butter and a cup of coffee and did not order a hamburger steak, and that he, witness, saw him in the restaurant around 11:15 and maybe it was a little later. Other evidence was given showing that the boy Delmer Wall was with his father the day he is said to have had his fall; also that defendants' witnesses who testified there was no accident on the 15th of October, 1930, were not at that part of the work on that day or the day he died; also that deceased hauled pipe that day.

Thereupon the Referee made his Findings of Fact and Rulings of Law as follows:—

"EMPLOYEE: George Wall (deceased).

"DEPENDENTS: Ollie Wall and Delmer Wall.

"EMPLOYER: Henry L. Lemons, Incorporated.

"INSURER: Century Indemnity Company.

"HEARING: February 25, 1931."

"1. Was there an accident? Yes.

"2. Date: October 15, 1930.

"3. Place: Waverly, Missouri.

"4. Was above employee in employ of about employer at time of accident? Yes.

"5. Did accident arise out of and in the course of the employment? Yes.

"6. Before and at time of accident had employer elected to accept the Act? Yes.

"7. Employee? Yes.

"8. What part of employer's compensation liability for accident is insured by above insurer? All.

"9. Work employee was doing for employer at time of accident: Truck driver.

"10. How accident happened: Tightening chain on pipe on truck slipped and fell about five feet to the ground.

"11. Did accident cause death? Yes. (If so, see findings 26 and 27.)"

"On or about October 15, 1930, George Wall sustained a personal injury by an accident arising out of and in the course of his employment with Henry L. Lemons, Incorporated. The above injury resulted in death on October 15, 1930.

"The employer had notice of the accident and a claim for compensation was filed within the time prescribed by law. [Sections 3336 and 3337, R. S. 1929.]

"It is my opinion that the employee sustained a personal injury by slipping and falling from his truck on October 15, 1930, and that this injury was the primary cause of his death."

The above finding and award of the Referee was reviewed by the full Commission on April 3, 1931, and was affirmed in all respects, and same was, on appeal to the circuit court, again affirmed.

It is urged that the circuit court erred in affirming the award of the Commission because the findings of fact do not support the award. We are wholly unable to agree with the contention. So far as concerns the evidence, it is abundant to show not only that the deceased was an employee of the corporation, the Henry L. Lemons, Inc., but that an accident occurred October 15, 1930, while employee was engaged as a truck driver in the work of such employer; that it arose out of and in the course of such employment; that the accident happened while the employee was tightening a chain on a pipe in a load of pipe on the truck being hauled for the employer and while doing so he slipped and fell a distance of five feet to the ground. Furthermore, the evidence was ample to support the finding that this fall caused his death. And the Referee's findings and rulings based on that evidence are findings of fact and not conclusions of law. In the Statement of Facts and Rulings of Law hereinabove set out, the statement or finding is that "the employee sustained a personal injury by slipping and falling from his truck on October 15, 1930, and that this injury was the primary cause of his death." This is a finding based on the evidence. It is a finding of an ultimate fact and not a mere conclusion or opinion based on nothing. [Schulte v. Grand Union Tea & Coffee Co., 43 S. W. (2d) 832, 835.] The medical testimony is sufficient to justify the Referee and the Commission on review, in saying the fall caused the employee's death; it is not necessary for the Commission to ascertain the precise anatomical results or lesions occurring in the body, which ended in death. The cases of Murphy v. Burlington Overall Co., 34 S. W. (2d) 1035, and Bricker v. Gille Mfg. Co., 35 S. W. (2d) 662, 664, are not in point because in those cases, there were *no* findings of fact.

This, and an analysis of the evidence together with all reasonable inferences to be drawn therefrom, as hereinbefore shown, *refutes the claim* that there was not sufficient competent evidence in the record to support the findings and to warrant the award. [Arnest v. Messerly, 17 S. W. (2d) 670; Donet v. Prudential Ins. Co., 23 S. W. (2d) 1104; A. D. Thompson & Co. v. Jepson, 217 N. W. 327; Roundtree v. Driscoll, 147 S. W. 537.] This is *not* a case where the award is based on mere conjecture, or opinion, unsupported by competent evidence; but it is supported by reasonable, natural and competent evidence.

[Allison v. Eyermann Const. Co., 43 S. W. (2d) 1063.] All of the findings were clearly supported.

As we understand it, the contention that the Commission acted in excess of its powers and without jurisdiction is the same point, but dressed in a different form from that considered and disposed of above. To construe the evidence in this case as being insufficient would undoubtedly violate the well established rule, of reasonable and liberal construction in favor of employee. [Pruitt v. Harker, 43 S. W. (2d) 769.] However, the point urged may rest upon, or include, the further claim that no notice was given employer and insurer of the accident and death, or claim therefor.

There was, however, ample evidence of notice given to the employer and insurer within the time required by section 3336, Revised Statutes 1929. The record shows a letter dated November 6, 1930, with accompanying notice, sent to the Commission, and a statement that copy of notice had been sent to both. On March 19, 1931, appellants' attorneys wrote a letter to the Commission notifying it of the filing of an application for review, together with a brief review of the testimony and the reasons why they thought the award should not be affirmed by the Commission and also stating the points they especially wanted "to call to the Commission's attention." *Nothing was said about want of notice* in either this letter or in defendants' *answer* to the claim for compensation. Moreover, it is in the record that the claim agent of the insurer appeared on the *day following the death* of the employee and took written statements of other employees concerning the whole matter. Strangely enough, defendants, when they were called on in the interest of the truth, to produce written statements, refused to produce them, which refusal gives rise to an unfavorable inference against them. [Arnest v. Messerly; Donet v. Prudential Ins. Co. of America; Roundtree v. Driscoll; Thompson v. Jepson; all hereinabove cited.]

The Commission was eminently justified in finding that notice was given; but, if not, notice was waived when no point was made for want of it before the Commission. [Hartwell Motor Co. v. Hickerson, 26 S. W. (2d) 153, 155.] In addition to this, it would seem to be clear that, where no issue on the question of notice or of any other matter was raised before the Commission, no such issue can be raised before us on appeal.

The judgment should be, and is, affirmed. *Bland* and *Arnold, JJ.,* concur.